1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

7   CARMEN MELONE,                                )
8                              Plaintiff,          )        Case No.  2:08-cv-00868-GWF
                                                  )
9   vs.                                           )        **ORDER**
                                                  )
10  PAUL EVERT'S RV COUNTRY, INC.,               )        **Defendant's Motion for Judgment**
                                                  )        **as a Matter of Law (#74)**
11                                                )
                               Defendant.         )
12  _____      )

13          This matter is before the Court on Defendant's Motion for Judgment as a Matter of Law

14   (#74), filed on August 19, 2010; Plaintiff's Opposition to Defendant's Motion for Judgment as a

15   Matter of Law (#80), filed on September 5, 2010; and Defendant's Reply to Plaintiff's Opposition

16   to Defendant's Motion for Judgment as a Matter of Law (#83), filed on September 17, 2010.   The

17   Court conducted a hearing in this matter on October 7, 2010.

18                                      **BACKGROUND**

19          Plaintiff Carmen Melone brought this action against his former employer Paul Evert's RV

20   Country, Inc. ("Paul Evert's")  pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C.

21   §  12101, et seq.  Plaintiff alleged that Defendant fired him from his job in violation of the Act

22   because of his disability resulting from prostate cancer.

23          Following the completion of discovery, Defendant moved for summary judgment on the

24   grounds that Plaintiff could not establish a disability within the meaning of the ADA as a matter of

25   law.  In opposition to the motion, Plaintiff argued that his impairments substantially limited him in

26   performing the major life activities of manual tasks, sleeping, standing, walking and working.  The

27   Court held that Plaintiff failed to present sufficient evidence to show that he was substantially

28   limited in performing the major life activities of working, manual tasks or sleeping.  The Court

held, however, that Plaintiff had made a sufficient evidentiary showing that his physical impairments substantially limited him in the major life activities of walking and standing. *See Order (36).* The Court's holding was based in significant part on Plaintiff's declaration and deposition testimony that he was "unable to walk or stand for extended periods of time (greater than 30 minutes)," (Pl. Decl. ¶ 8, Dkt. #30-3 at 2), and that after walking or standing for 30 minutes, he needed to sit and rest until the fatigue receded and he regained his strength. (*Id.* at 40-41). *Order (#36)*, p. 15. As discussed herein, at trial, Plaintiff did not testify to these specific time limits on his ability to walk and stand.

The action was tried to a jury from July 19 to 22, 2010. Defendant orally moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure at the conclusion of Plaintiff's case-in-chief and again before the case was submitted to the jury. The Court denied Defendant's oral motions. The jury thereafter returned a verdict in Plaintiff's favor and awarded him emotional distress damages in the amount of $40,000.01. *Special Verdict (#64).*[1] Defendant filed a renewed motion for judgment as a matter of law on August 19, 2010 on the ground that Plaintiff failed to show, as a matter of law, that he has a disability within the meaning of the ADA. Alternatively, Defendant argues that the evidence did not support an award of emotional distress damages or that the damages awarded by the jury are excessive. The following summary of the evidence focuses on these two issues.

Plaintiff was employed as a commission salesman by Defendant at its sales facility in Laughlin, Nevada from 2003 until March 16, 2007. The busy season for Defendant's business in Laughlin was from October to April. During this season the sales personnel were generally required to work seven days a week. Mr. Melone was diagnosed with prostate cancer in September, 2006. He underwent prostate removal surgery at the UCLA Medical Center on December 12, 2006 and was out of work until January 15, 2007. When Mr. Melone returned to work in January 2007, the salesmen were on a seven day work schedule. The schedule was

---

[1] Plaintiff's claims for recovery of back pay and related compensation benefits was tried to the Court on September 1, 2010. The Court has reserved judgment on that portion of Plaintiff's ADA claim pending its decision on Defendant's motion for judgment as a matter of law.

1    changed to six days a week in the first week of February, 2007.

2         As part of his job, Mr. Melone was required to patrol the RV sales lot and go in and out of

3    motor homes ("RVs") to look for potential customers and attempt to sell them motor homes.  Mr.

4    Melone testified that upon returning to work in January 2007, he had difficulty walking and

5    standing.  He explained that he had undergone a radical prostatectomy which involved an incision

6    from his navel to his pelvis.  He was not completely healed when he returned to work and he

7    realized he should not be climbing steps into motor homes as much as he had been doing.  Tr.-I

8    68:19-25.[2]   He testified as follows:

9              . . . I had problems standing because of the pain.  I had problems
               walking.  I had problems climbing into motor homes.  And it -- it
10             started out gradually, and then I also had general urinary problems.
               That was a whole separate issue and -- which required a separate
11             surgery later.  But I had problems urinating.  Tr.-I  69:2-7.

12        Mr. Melone testified that he had the feeling of having to urinate and a burning feeling which

13   became increasingly worse.  Tr.-I  69:5-19.  Mr. Melone also experienced fatigue.  He testified:

14             I mean, I tired easily.  I would say in the morning I did really well,
               and by the afternoon I was -- I was really tired.  And I -- and I knew
15             that I would not be able to go six days a week let alone seven days a
               week.  Even on a six-day week schedule -- and I probably should
16             have been working five days.  I probably should have been working a
               little less than that.  But I figured I would ask for five days.  Tr.-I
17             70:1-7.

18        Mr. Melone testified on cross-examination that following the surgery, his doctor had

19   advised him to take it easy and stay off work for six weeks.  Tr.-II  49:14-15.  His doctor

20   specifically told him not to do anything too strenuous.  Tr.-II  62:21-23.  Mr. Melone decided,

21   however, to return to work a month after his surgery.  Tr.-II  49:16-17.  He acknowledged that his

22   doctor did not place any restriction on him once he returned to work.  Tr.-II  49:18-25.

23        Mr. Melone testified that like other salesmen, he used the company's computer, which was

24   located in the showroom or office lobby, for both business and personal reasons.  He testified that

25   personal use was allowed.  For business purposes, he used the computer to send photographs of

26   _____

27        [2] The transcriber separately numbered the transcript pages for each trial day, beginning with
     page one.  The Court therefore refers to the transcripts with the designations "Tr.-I" and  "Tr.-II" to
28   reflect the transcript for the first and second day of trial.

motor homes to customers and to obtain information from the manufacturer(s). The company's business telephone was located next to the computer and he would answer the phone while using the computer.  Mr. Melone testified that this allowed him to develop additional sales leads from potential customers who called in.  Tr.-I  93:25-95:13.  Mr. Melone testified that because "I didn't feel that well for walking around for long periods of time, I would spend my time in the computer." Tr.-I  95:16-17.

Mr. Melone testified that he told the sales manager, Tom Schmid, that he had trouble standing and walking.  Tr.-II  54:25-55:7.  He also told employees Gary Lee and Ron Henderson that he had problems standing and walking.  Tr.-II  64:12-14.  He told his doctor that he was having problems with fatigue and problems with pain and urination.  Tr.-II  55:8-10.  He also told the doctor that he had pain standing.  Tr.-II  55:13.  He indicated that the pain got better when the scar tissue healed.  Tr.-II  55:18-20.

Mr. Melone testified that during the first week of February he asked Mr. Schmid for permission to work five days a week instead of six.  Mr. Schmid responded that Plaintiff was not special and that everybody had to work six days.  Tr.-I  73:19-24.  Mr. Melone thereupon requested a letter from his doctor stating that he should only work five days a week.  Tr.-I  74:1.   In a February 6, 2007 email to the doctor's assistant, Mr. Melone stated:

> My employer is currently requesting all sales agents to work 7 days per week thru February.  I struggled with this in January.  Could you please e-mail me a Doctor's note to only work 5 days per week thru February or until I finish my tests in March.  I'm exhausted.

*Plaintiff's Exhibit "15."*

Mr. Melone also stated in the email that he was "urinating very frequently (every 2 hours & 3+ times at night and have a weak stream." He inquired whether this was normal.  *Id.*

Dr. Reiter signed a letter dated February 12, 2007 which stated: "This is to certify that Mr. Melone is under my professional care for prostate surgery.  I have advised him not to exceed a 5 day work week until his next follow-up appointment in March." *Plaintiff's Exhibit "16."*  This letter was faxed to Paul Evert's RV on February 15, 2007.  Mr. Melone retrieved the letter from the finance manager in whose office the fax machine was located.  He told Mr. Schmid that he had the

4

1    letter and Mr. Schmid instructed him to put the letter on Mr. Schmid's desk, which Mr. Melone

2    did.  Tr.-I  76:8-20.  Mr. Melone testified that nothing further happened after he put the letter on

3    Mr. Schmid's desk.  Tr.-I  80:1-6.  Apparently, Mr. Schmid did not discuss the letter with him and

4    Mr. Melone did not follow-up with Mr. Schmid to ask whether he could reduce his work schedule

5    to five days.

6          Mr. Melone testified that in the early part of February, his urinary problems were not as

7    severe as they later became.  At the beginning of February, he needed to urinate every two hours.

8    Later on, he needed to urinate more frequently.  Tr.-II  52:2-18.  Mr. Melone testified that his

9    urinary problems continued to get worse after February 15, 2007.  His urinary tract was closing and

10   he went to UCLA Medical Center for a follow-up examination on March 14, 2007.  During that

11   visit, his doctor scheduled him for further surgery on April 24, 2007.  Tr.-I  80:20-23.  His pain

12   and fatigue, and resulting limitations on his ability to stand and walk, however, remained the same.

13   Tr.-I  80:12-17.

14         Mr. Melone returned to work on March 15th.  Tr.-I  80:25-81:1.  He informed Mr. Schmid

15   about the scheduled surgery in April.  Mr. Schmid did not say anything at that time.  Tr.-I  82:11-

16   83:17.  When Mr. Melone came to work the next day, however, Mr. Schmid called him into his

17   office, told him that he was no longer needed and terminated his employment.  Tr.-I  84:2-6.

18         Mr. Melone was asked about the nature of his physical limitations after he was fired on

19   March 16, 2007.  He testified as follows:

20              I, you know, obviously after my scar, after my scar tissue started to
             heal, I started to feel better.  I didn't have, you know, that pain.
21
             It was a large scar.  I had adhesions, and that is -- I have pain from
22           that.  I have, do you want me to say currently or in -- . . .  Tr.-I
             89:12-14.
23

24   Plaintiff's counsel thereupon went to a different topic and did not ask Mr. Melone to

25   explain what his current condition was with regard to pain from the surgical adhesions.

26         At the time of his termination, Mr. Melone was still under the care of Dr. Reiter at UCLA.

27   He subsequently changed doctors.  At the time of trial, he was under the care of Dr. Yu of Seattle

28   Cancer Care.  Tr.-I  90:8-91:2.  Mr. Melone was not on any cancer related medication at the time he

1    was fired.  Tr.-I  91:5-8.  He began taking Lupron, a hormone therapy medication, in November

2    2007.  Tr.-I  91:13-23.

3         Mr. Melone was asked on cross-examination to state the physical requirements of his job as

4    an RV salesman.  He stated that they were walking and standing, primarily.  Tr.-II  45:23-46:4.  Mr.

5    Melone denied that he stayed in the lobby "so often" after the surgery or that he was in the lobby

6    more than the other salesmen.  Tr.-II  46:16-47:6.  Following the surgery, Mr. Melone was not able

7    to use his bicycle to ride around the RV sales lot.  Instead, he used a golf cart when it was available.

8    Mr. Melone testified that he would have to get off the golf cart to greet a customer and to climb

9    into motor homes to see if customers were there.  Tr.-II  47:12-20.

10        Mr. Melone testified that RV sales were "off," i.e. low, in January to March 2007.  Tr.-II

11   66:17-23.  Mr. Schmid told all the salesmen that they needed to sell more.  Tr.-II  67:5-8.  Mr.

12   Melone also testified that Mr. Schmid told him:  "You're a way better salesman than what you're

13   doing."  He told Mr. Melone:  "Your sales should be better than what they are."  Tr.-II  69:15-18.

14   Mr. Melone agreed with these statements, but testified that he had limitations.  He further

15   explained:

16              I couldn't walk.  I was in pain going up steps.  I know what my
             limitations are.  The doctor said,  "If you have any problems, just take
17              it easy."  Tr.-II  69:24-70:1.

18        Plaintiff called Ron Henderson as a witness.  Mr. Henderson was also a salesman at Paul

19   Evert's RV.  He testified that during the last year or year and a half of Mr. Melone's employment,

20   they worked together as a sales team.  Tr.-II  78:12-16.  Mr. Henderson testified that Mr. Melone

21   was sore from his surgery after he returned to work.  He stated that Mr. Melone bought another

22   salesman's golf cart to use on the RV lot.  Tr.-II  85:10-17.  Mr. Henderson described the duties of

23   a salesman at the RV lot as "an on-your-feet job."  The salesmen were required to cover the few

24   acres of the sales lot and go from coach to coach.  The job required quite a bit of walking and

25   standing.  Tr.-II  86:1-5.  Mr. Henderson testified that following Mr. Melone's surgery, he did

26   much of the leg work for he and Mr. Melone in greeting customers and showing them in and out of

27   coaches.  Tr.-II  87:24-88:1.  He did this because Mr. Melone "was a little bit sore from his

28   operation and he wasn't quite as physically able to go up and down coaches . . .  for a period of

1    time there." Tr.-II 87:3-5.

2         The parties stipulated in the joint Pretrial Order (#39) to the admission of a number of

3    Plaintiff's exhibits that would not generally be admissible over objection. Some of these exhibits

4    provide additional information regarding the nature of Plaintiff's physical problems and limitations

5    following his return to work after the surgery and also after he was fired on March 16, 2007. In a

6    June 12, 2009 letter or memorandum, Mr. Melone stated that when he returned to work at Paul

7    Evert's:

8              I was a different person. I was fighting a life threatening disease that
               stole my manhood. I was physically and emotionally damaged.
9              While at work, I tried to stay focused and for the most part I did.
               And the records will show that I did above average but I could have
10             done better if I hadn't been going through physical and emotional
               trauma. It was something that only time would help.

11

12    *Plaintiff's Exhibit "25."*

13         According to a chronology that Mr. Melone prepared, he accepted a job offer with an RV

14    sales company in Portland, Oregon on November 4, 2007. He also indicated that he worked RV

15    sales shows on 19 days in January, 2008 and on 8 days in February 2008. *Plaintiff's Exhibit "28."*

16    The chronology also states that his PSA (prostate-specific antigen) blood test level continued to rise

17    after his surgery and after he was fired. According to a 2/26/08 entry in Mr. Melone's chronology:

18             Dr. Daneshmand at OHSU ordered a CAT scan and bone scan and
               placed me on a 90-day course of Lupron hormone therapy. The
19             doctor explained to me that I have terminal advanced prostate cancer
               and has now spread throughout my body and has to be treated
20             systemically. It is no longer localized.

21    *Plaintiff's Exhibit "28."*

22         In a postscript to this entry, Mr. Melone further stated:

23             The Lupron has made me excessively fatigued and produced intense
               hot flashes also I am beginning to feel the effects of latent depression
24             as a result of this disease and being fired from my job.

25    *Id.*

26         The chronology also stated that Mr. Melone worked a 3-day RV show in mid-March 2008.

27    He stated in a postscript to this entry, however, that he was "[t]oo fatigued to work any more RV

28    shows." *Id.* He also stated in a 5/30/08 entry that he received another 90 day course of Lupron

                                          7

1    medication which made him extremely tired.  He reported being in bed all day, every other day, and

2    was experiencing intense hot flashes.  He also stated that "[t]his entire affair has caused me to be

3    latently depressed. *Id.*

4            In regard to the emotional distress or anxiety that Mr. Melone experienced as a result of

5    being fired, he testified at trial as follows:

6                     Like I said, when I got fired it was a big shock to me, because of the
                      other problems I was going through and then being fired, I had a lot
7                     of emotional distress.  I hid it really well.  I don't, you know, because
                     I didn't want to get my wife upset, but I did have a lot of anxiety, had
8                     a lot of sleepless nights.  And it bothered me.

9    Tr.-I  106:6-11.

10           Mr. Melone also testified that his wife stated that he was getting real moody.  Tr.-I  106:18-

11    19.  Mr. Melone could not, however, identify any activities he was no longer able to participate in

12    because of his emotional distress.  Tr.-I  106:24-107:9.

13                                  **DISCUSSION**

14        **1.**        **Applicable Standard On Motion for Judgment as a Matter of Law.**

15        The standard for granting a motion for judgment as a matter of law under Rule 50(b) of the

16    Federal Rules of Civil Procedure is set forth in *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th

17    Cir. 2002).[3]  The court can overturn the jury's verdict and grant such a motion only if "there is no

18    legally sufficient basis for a reasonable jury to find for that party on that issue." *Id.*, citing *Reeves*

19    *v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,149, 120 S.Ct. 2097, 2109-10 (2000).  The

20    court may not substitute its view of the evidence for that of the jury.  *Costa v. Desert Palace, Inc.*,

21    299 F.3d at 859, citing *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 9th Cir.

22    2001).  Nor may the court make credibility determinations or weigh the evidence.  The court,

23    instead, must draw all inferences in favor of the nonmoving party.  *Id.,* citing *Reeves,* 530 U.S. at

24    150, 120 S.Ct. 2097 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91

25

26           [3] Because the Court reserved the equitable issue of back-pay and other compensation for
27    decision by the court, final judgment was not entered upon the jury verdict.  Defendant filed its
        motion 28 days after the jury returned its verdict and was discharged by the Court.  Accordingly,
28    Defendant's motion was timely filed under Fed.R.Civ.Pro. 50(b).

1  L.Ed.2d 202 (1986)).  The court should also disregard all evidence favorable to the moving party

2  that the jury is not required to believe.  *Costa*, 299 F.3d at 859.  The Supreme Court has also stated

3  that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter

4  of law, such that 'the inquiry under each is the same.'"  *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097,

5  citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-251, 106 S.Ct. 2505 (1986).

       **2.**    **Whether There Was Sufficient Evidence that Plaintiff Had a Disability Within the Meaning of the ADA.**

8        The ADA requires private employers to provide reasonable accommodations to the known

9  physical or mental limitations of an otherwise qualified individual with a disability, unless the

10  employer can demonstrate that the accommodation would impose an undue hardship.  *Toyota*

11  *Motor Manufacturing Kentucky, Inc. v. Williams*, 534 U.S. 184, 193, 122 S.Ct. 681, 689 (2002),

12  citing 42 U.S.C. §12112(b)(5)(A).  The Act defines a "qualified individual with a disability" as an

13  "individual with a disability who, with or without reasonable accommodation, can perform the

14  essential functions of the employment position that such individual holds or desires."  *Id.*, citing

15  §12111(8).

16        "Disability" is defined as (A) a physical or mental impairment that substantially limits one

17  or more major life activities of such individual; (B) a record of such an impairment; or (C) being

18  regarded as having such an impairment." 42 U.S.C. § 12102(2).  Whether a plaintiff's physical or

19  mental condition constitutes a disability under the ADA involves three inquiries:  (1) whether the

20  condition is a physical impairment, (2) whether the life activities from which the plaintiff is

21  impaired amount to major life activities, and (3) whether the plaintiff's impairment substantially

22  limits him from performing the identified major life activities.  *Gribben v. United Parcel Service,*

23  *Inc.*, 528 F.3d 1166, 1169 (9th Cir. 2008), citing *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct.

24  2196 (1998).

25        The HEW Rehabilitation Act regulations define "physical impairment" as "any

26  physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or

27  more of the following body systems:  neurological; musculoskeletal; special sense organs;

28  respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic

and lymphatic; skin; and endocrine." 45 CFR §84.3(j)(2)(i) (2001).  The Supreme Court has noted

that the commentary accompanying the HEW regulations indicates that diseases or disorders such

as cancer may constitute physical impairments.  *Bragdon*, 524 U.S. at 633, 118 S.Ct. at 2202.

Merely having an impairment, however, does not make one disabled for purposes of the ADA.

The claimant must also demonstrate that the impairment substantially limits a major life activity.

*Toyota*, 534 U.S. at 194, 122 S.Ct. at 690 citing 42 U.S.C. § 12102 (2)(A).  In *Gordon v. E.L.*

*Hamm & Associates*, 100 F.3d 907, 912 (11th Cir. 1996), for example, the court stated that the side

effects that the plaintiff suffered as a consequence of his chemotherapy treatments for cancer may

have qualified as physical impairments, but they did not substantially limit plaintiff's ability to care

for himself or to work.

     The EEOC, by regulation, defines "substantially limited" as:

          i)     Unable to perform a major life activity that the average
                   person in the general population can perform; or

          ii)    Significantly restricted as to the condition, manner or
                   duration under which an individual can perform a particular
                   major life activity as compared to the condition, manner, or
                   duration under which the average person in the general
                   population can perform that same major life activity.

     29 C.F.R. § 1630.2(j) (2001).

     The regulations further provide that whether someone is substantially limited in a major life

activity is to be examined using such factors as:

          i)     The nature and severity of the impairment;

          ii)    The duration or expected duration of the impairment; and

          iii)   The permanent or long-term impact, or the expected or long-
                   term impact of or resulting from the impairment.

     29 C.F.R. § 1630.2(j)(i)-(iii).

     While the Supreme Court does not accord the EEOC regulations the same level of

deference that it accords to the Rehabilitation Act regulations, it considered the EEOC regulations

in *Toyota* in determining the meaning of "substantially limited" under the ADA.  *Toyota*, 534 U.S.

at 197, 122 S.Ct. at 691.  The Ninth Circuit also follows these regulations in construing the

10

meaning of "substantially limited."  *See Gribben v. United Parcel Service, Inc.*, 528 F.3d 1166, 1170 (9ᵗʰ Cir. 2008).

The HEW Rehabilitation Act regulations define "Major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  45 C.F.R. § 84.3(j)(2)(ii).  *Toyota* states that the word "major," as used in the phrase "major life activities," means important. *Id.*, 534 U.S. at 197, 122 S.Ct. at 691.  In *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1061 (9ᵗʰ Cir. 2005), the court stated that "[w]e have recognized that the illustrative list of major life activities requires the activity only to be of comparative importance and central to the life process itself, and it need not have a public, economic, or daily character.  To be a major life activity, the activity need not be essential to survival, but rather of central importance to most people's daily lives."  (internal quotation marks omitted).

The issue in *Toyota* was whether plaintiff's carpal tunnel syndrome and bilateral tendinitis substantially limited her in the performance of manual tasks.  The Court stated that in order for manual tasks to fit within the category of major life activities, the impairment must prevent or severely restrict the individual from doing activities that are of central importance to most people's daily lives.  The impairment must also be permanent or long term. *Id.*, 534 U.S. at 197-8, 122 S.Ct. at 691.  The Court further stated that when addressing the major life activity of performing manual tasks the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.  In reversing the Sixth Circuit Court's decision granting partial summary judgment to the plaintiff,  the Supreme Court held that the court erred by disregarding the very type of evidence it should have focused on--plaintiff's ability or inability to tend to her personal hygiene and to carry out personal and household chores.  The Court stated that these are the types of activities that are of central importance to most people's daily lives and should have been part of the court's assessment in determining whether the plaintiff was substantially limited in performing manual tasks. *Id.*, 534 U.S. at 201-2, 122 S.Ct. at 693.  The evidence showed that even after plaintiff's medical condition worsened, she could still brush her teeth, wash her face, bathe,

1  tend to her flower garden, fix breakfast, do laundry, and pick-up around the house.  Her medical

2  conditions, however, caused her to avoid sweeping, to quit dancing, to occasionally seek help

3  dressing, and to reduce how often she played with her children, gardened, and drove long

4  distances.  The Court held that these changes in plaintiff's life did not amount to such severe

5  restrictions in the activities that are of central importance to most people's daily lives that they

6  established a manual task disability as a matter of law.[4]

7          The Ninth Circuit holds that a plaintiff is not required to present comparative evidence or

8  medical evidence to establish a genuine issue of material fact regarding the impairment of a major

9  life activity at the summary judgment stage.  *Gribben v. United Parcel Service, Inc.*, 528 F.3d at

10  1170, citing *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005).  In *Gribben*, the

11  plaintiff was diagnosed with dilated cardiomyopathy and paraxysmal arterial fibrillation.  The

12  plaintiff testified that as a result of this condition, he became light headed, had difficulty

13  concentrating and breathing, had chest pain when undertaking activities in extreme heat for

14  extended periods of time, and had similar symptoms when lifting weight over 50 pounds.  He was

15  told by his cardiologist not to engage in certain activities more than 20 minutes at a time in

16  temperatures above 90 degrees.  *Id.*, 528 F.3d at 1168.  The district court granted the employer's

17  motion for summary judgment because the plaintiff failed to submit any evidence as to the abilities

18  of an average person in the general population to participate in outdoor activities in the "Phoenix

19  summer."  In reversing, the Ninth Circuit stated that plaintiff's testimony regarding the

20  significance of his impairment was sufficient to create a genuine issue of material fact at the

21  summary judgment stage.  In so holding, the court distinguished cases such as *Wong v. Regents of*

22  *the University of California*, 410 F.3d 1052 (9th Cir. 2005), in which the nature of the impairment

23  claimed by the plaintiff was implausible and therefore necessitated a higher evidentiary burden.

24  *Gribben* further stated:

25  . . .

26  _____

27      [4] The Court declined to consider whether the district court's order granting summary
   judgment to the defendant employer should be reinstated because the defendant did not request

28  that relief in its petition for certiorari.  *Toyota*, 534 U.S. at 202-3, 122 S.Ct. at 694.

To determine whether the grant of summary judgment was appropriate, we must review the evidence of Gribben's alleged impairment. *Id.* at 1059. Gribben's cardiologist testified at his deposition that Gribben had nonischemic cardiomyopathy, and that when Gribben worked in the extremes of heat, he experienced shortness of breath, weakness and chest pain. The cardiologist also testified that Gribben could not do any heavy lifting or exertion for prolonged periods of time. Gribben asserted that as a result of this disability, he experienced "labored breathing," that he could not "be in heat for extended periods of time," and that he experienced dizziness, fatigue and difficulty concentrating. He testified at his deposition that he experienced labored breathing when he was anxious and when he exerted himself too much and in the heat. Gribben testified that he had labored breathing "on and off all the time" and that the labored breathing stopped him from doing work that required too much exertion such as jobs that require "loading or unloading trailers or sorting" or extended physical activity such as lifting. He also testified that his heart condition substantially limits his ability to walk, run, climb, pull, push, squat, bend, lift and breathe.

The court held that this testimony was sufficient to establish a genuine issue of material fact as to whether plaintiff's impairment was substantial and limited his ability to perform regular daily activities including breathing, thinking and physical activities in temperatures of 90 degrees or more.

In *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1058-59 (9th Cir. 2005), the court stated that while the plaintiff is not required to present comparative or medical evidence to establish that he is substantially limited by the impairment in performing a major life activity, he must present evidence in sufficient detail to convey the existence of an impairment. The court held that the plaintiff met that requirement. In so holding, the court distinguished *Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003). The plaintiff in *Fraser* established through medical testimony that she had severe and life threatening diabetes. The court had no difficulty in concluding that diabetes qualifies as a physical impairment under the ADA. The court noted that under *Sutton v. United Airlines*, 527 U.S. 471, 491 119 S.Ct. 2139, 2151 (1999), the trier of fact is also required to consider whether the plaintiff's efforts to mitigate the disease constitute substantial limitations. *Id.*, 342 F.3d at 1038-39. (*See also Rohr v. Salt River Project Ag. Impr. and Power Dist.*, 555 F.3d 850, 859 (9th Cir. 2009) ("if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures-both positive and negative-must be taken into

13

account when judging whether that person is substantially limited in a major life activity and thus 'disabled' under the Act.")) The court found that plaintiff had presented sufficient evidence that she was substantially limited in the performance of the major life activity of eating. The plaintiff failed, however, to present sufficient evidence that she was substantially limited in the major life activity of caring for one's self. The plaintiff argued that when she was unsuccessful in obtaining a proper blood sugar level, she could not properly care for herself. She described past difficulties in bathing, walking, getting ready for work, driving and other such activities. The court stated, however:

> The problem is that Fraser does not show that these effects occurred often enough to constitute a substantial limitation. While there is evidence that Fraser is substantially limited in eating because of her severe and demanding restrictions, there is no evidence that she is so unsuccessful in monitoring her blood sugar levels that she is substantially limited in caring for herself. *Accord Orr v. Wal-Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir.2002). In her brief, she argues that she presented evidence that in mid-November 1998, in February of 1999, and twice in March of 1999, she suffered insulin reactions that severely limited her ability to care for herself. But being unable to care for oneself four times during a five month period is not a *substantial* limitation. She is not "significantly" restricted in caring for herself as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). *EEOC v. Sara Lee Corp.,* 237 F.3d 349, 353 (4th Cir.2001) (holding that one or two nocturnal seizures a week and occasional daytime seizures do not substantially limit plaintiff's ability to care for herself).

*Fraser*, 342 F.3d at 1043-44.

In *Orr v. Wal-Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir. 2002), cited in *Fraser*, the plaintiff also claimed that he was disabled within the meaning of the ADA because of his diabetes. In support of his claim, the plaintiff stated that his diabetes substantially affected his ability to see, speak, type, read, and walk. He also argued that "'it would not be unreasonable to expect that [his] diabetic condition *will* significantly disrupt his lifestyle.'" The plaintiff also contended that if he failed to properly monitor and treat his condition, "he . . . 'could experience' adverse symptoms which '*would* substantially limit [his] major life activity of working.'" *Id.* In affirming summary judgment for the employer, the court stated that "[t]he Supreme Court in *Sutton* expressly ruled that [a] disability exists only where an impairment substantially limits a major life activity, not where it *might*, *could,* or *would* be substantially limiting if mitigating measures are not taken.

14

*Sutton*, 527 U.S. at 482, 119 S.Ct. 2139." (internal quotation marks omitted.)  The court stated that it was required to examine plaintiff's present condition with reference to the mitigating measures taken and the actual consequences which followed.  The court held that plaintiff failed to present evidence explaining how his diabetes substantially affected his major life activities or the duration and frequency of any limitations.

In this case, Plaintiff Carmen Melone was diagnosed with prostate cancer in September 2006.  No evidence was presented at trial that Plaintiff experienced any physical symptoms from the cancer, or was physically impaired by such symptoms, before undergoing prostate removal surgery in December, 2006.  Following his surgery and return to work, however, Mr. Melone experience physical pain, urinary problems and fatigue as consequences of the surgery and, as he acknowledged, from probably returning to work too soon after the surgery.  These consequences of medical treatment for a disorder or disease can also constitute physical impairments.

Mr. Melone testified that because of the pain from the surgical incision, he had difficulty walking, standing and climbing steps or stairs.  He also had urinary problems which included a burning sensation and the need to urinate frequently.  The urinary problem grew worse after Mr. Melone returned to work and ultimately led him back to see his doctor on March 14, 2007, at which time the doctor scheduled him for urinary surgery in late April to correct these problems.  Mr. Melone also experienced fatigue.  He testified that he did really well in the mornings, but became really tired in the afternoon.  It is reasonable to infer from Mr. Melone's testimony that he experienced these symptoms every day from the time he returned to work on January 15, 2007 until he was fired on March 16, 2007.

Notwithstanding his symptoms and limitations, Mr. Melone testified that he was able to perform his job as a salesman by taking certain measures, including using a golf cart to traverse the RV lot, having Mr. Henderson assist him in dealing with customers and spending more time using the computer and answering customer telephone calls in the office.  The one accommodation that Mr. Melone sought from the Defendant, and which was denied, was that he be permitted to work a five day week which would give him more time to rest.  Mr. Melone's trial testimony was vague, however, regarding the extent to which pain or fatigue limited his ability to walk and stand during

15

1     the period from January 15 to March 16, 2007.  He did not testify as to what distance he could

2     walk without having to stop.  Likewise, he presented no testimony as to how long he was able to

3     stand before he needed to sit or lie down.  Nor did he describe to what extent he was able or unable

4     to climb in and out of motor homes as part of his job duties.

5         Although Mr. Melone stated in his pre-trial declaration and deposition that he was unable

6     to walk or stand for extended periods of time greater than 30 minutes, and that he would then need

7     to sit and rest until the fatigue receded and he regained his strength, he gave no such testimony at

8     trial.  Even if Mr. Melone had so testified, it is debatable whether such testimony would have been

9     sufficient to establish that he was substantially limited in the major life activity of walking or

10    standing.  *See Williams v. Excel Foundry & Machine, Inc.*, 489 F.3d 309, 311-312 (7th Cir. 2007)

11    (plaintiff's testimony that he could not stand for more than 30 to 40 minutes at a time without

12    briefly sitting or lying down to alleviate discomfort, and inability to balance on one leg did not

13    constitute significant restrictions on activity of standing) and *Taylor v. Pathmark Stores, Inc.*,  177

14    F.3d 180, 186 (3rd Cir. 1999) (plaintiff's ability to walk with a slight limp and stand for 50 minutes

15    before being required to take a ten minute break did not constitute substantial limitation).

16         Mr. Melone's trial testimony was focused on how his impairment limited his ability to

17    walk and stand in the performance of his job as an RV salesman.  He provided no testimony as to

18    how his limitations affected his ability to perform other activities of daily living, such as caring for

19    himself, or performing household chores, yard work, grocery shopping, or engaging in social or

20    recreational activities that involve walking and standing.  *Toyota* stated that evidence regarding the

21    plaintiff's ability to perform these types of activities, which are of central importance to most

22    people's daily lives, should have been considered in assessing whether the plaintiff was

23    substantially limited in the major life activity of performing manual tasks.  *Toyota*,  534 U.S. at

24    201-202, 122 S.Ct. at 693-94.

25         It is not always necessary, however, that a plaintiff present such testimony.  In *Gribben*, for

26    example, the plaintiff's description of his physical limitations related to his inability to perform

27    physical work tasks.  The court found that plaintiff's description of the nature and severity of his

28    physical limitations was sufficient to create a genuine issue of material fact.  Stated otherwise,

where the plaintiff shows that his impairment significantly restricts him in performing work-related physical activities, such as walking, it may be reasonable to infer that plaintiff is also significantly restricted in performing other activities of central importance to most people's lives. Mr. Melone's general and vague testimony, however, established only that he had some limitations in walking and standing while performing his work duties as an RV salesman. He failed to provide sufficient detail about his limitations, however, to support a reasonable inference that he was *substantially limited* in the ability to walk and stand as compared to the average person in the general population. Because he also failed to provide any information regarding limitations on his ability to engage in other activities, there was no alternative basis upon which the jury could have found that he was substantially limited in the ability to walk or stand.

The fact finder is also required to consider the duration or expected duration of the impairment, and its permanency or long-term impact. 29 C.F.R. § 1630.2(j)(i)-(iii). *Toyota*, 534 U.S. at 198, 122 S.Ct. at 691. Mr. Melone testified that the pain he experienced from January 15 to March 16, 2007 was caused by his surgical scar which had not yet healed. Tr.-1 68:19-25. He testified, however, that "after my scar tissue started to heal, I started to feel better. I didn't have, you know, that pain." Tr.-I 89:12-14. Mr. Melone did not provide any specifics as to when the scar tissue healed or what, if any, walking or standing limitations remained after the pain subsided and he started to feel better. While Mr. Melone appeared to testify that he still has some pain from "adhesions," he never described the extent of that pain.

Mr. Melone underwent the urinary tract surgery on April 25, 2007. According to his chronology, there was a two week recovery period after that surgery. *Plaintiff's Exhibit "28."* Plaintiff did not present evidence, however, as to whether his urinary problems remained or resolved after that surgery. It should also be noted that Mr. Melone did not testify that his urinary symptoms contributed to his problems with walking, standing or with fatigue. According to Plaintiff's chronology, he was advised on or about February 26, 2008 that his prostate cancer had now spread through his body and had to be treated systematically. He was thereafter placed on Lupron hormone therapy medication which made him excessively fatigued and caused intense hot flashes. While the evidence shows that Plaintiff's prostate cancer further progressed after March

17

16, 2007, he failed to present evidence that he was substantially limited in his ability to walk or stand between that date and late 2007 or early 2008 when he began a regimen of hormone therapy treatment.[5]  The jury was again left to speculate about Plaintiff's physical condition and limitations, if any, during that period.

The Court therefore finds that Plaintiff failed to present sufficient evidence at trial that he was substantially limited in performing major life activities prior to the termination of his employment on March 16, 2007.  Plaintiff also failed to present evidence that his physical impairments were permanent or of long-term duration, and not simply temporary impairments that he experienced while recovering from his prostate surgery.  Nothing stated herein is intended to justify the Defendant's conduct in firing Mr. Melone.  In order for liability to be imposed under the ADA, however, the claimant must prove that he is a "qualified individual with a disability."  In this case, Plaintiff failed, as a matter of law, to show that he was disabled within the meaning of the Act.[6]

**3.**   **Whether There Was Sufficient Evidence to Support the Jury's Award of Emotional Distress Damages.**

The foregoing decision on liability disposes of Defendant's alternative argument, first raised in its Reply Brief (#83), that the evidence was insufficient to support an award of damages for emotional distress or that the amount awarded by the jury was excessive.  Generally, issues raised for the first time in a reply brief are considered waived.  *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir. 2007), citing *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990).  Plaintiff was not afforded the opportunity to oppose, in writing, Defendant's arguments on the damages award.  The Court finds, however, that even if the damages issue is reached, the jury's damage award is supported by sufficient evidence and is not excessive.

---

[5] Although Mr. Melone's chronology indicates that he began taking Lupron in or about February 2008, he testified at trial that he began taking Lupron in November 2007.

[6] Plaintiff did not allege in his complaint and presented no evidence at trial that he was regarded as disabled by Defendant.  Nor did he raise this as a basis for affirming the jury verdict in his opposition to Defendant's motion for judgment as a matter of law.

1        Emotional distress damages are recoverable in a civil action for violation of the ADA.

2  *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995).[7]  There is no

3  requirement in the Ninth Circuit that an award of damages for emotional distress be supported by

4  objective evidence.  *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003).

5  The plaintiff's testimony alone may be enough to substantiate the jury's award of emotional

6  distress damages.  *Id.*  The amount of damages should be reversed only if it is grossly excessive or

7  monstrous.  *Zhang*, 339 F.3d at 1040, citing *Lambert v. Ackerley*, 180 F.3d 997, 1011 (9th Cir.

8  1999) (en banc), *cert. denied*, 528 U.S. 1116, 120 S.Ct. 936 (2000).  *See also Smith v. City of*

9  *Oakland*, 538 F.Supp.2d 1217, 1240 (N.D.Cal. 2008).

10        In *Zhang*, the jury found that plaintiff was retaliated against and ultimately fired because of

11  his Chinese ethnicity and nationality.  The amount of emotional distress damages awarded to

12  plaintiff was calculated as either $223,155 or $123,155.  In upholding the award under either

13  amount, the Ninth Circuit relied on plaintiff's testimony that his job at defendant's company was

14  his "dream, working in this country," that when he was terminated, he was "troubled," and

15  "couldn't believe" it.  The plaintiff also testified that letters that the defendant sent to his suppliers

16  about his termination made it seem like he was either a criminal or something bad, and hurt his

17  dignity and reputation.  The court stated that "the jury obviously could have gleaned that he was

18  greatly hurt and humiliated by his termination and the manner in which it was carried out."  *Zhang*,

19  339 F.3d at 1040-41.

20        In *EEOC v. AIC Security Investigations, Ltd.*, which was decided in 1995, the Seventh

21  Circuit upheld an award of $50,000 in emotional distress damages to a plaintiff who was fired

22  because of his terminal brain cancer.  The court noted that "[t]he district court found that there was

23  a rational connection between the evidence and the damage award."  The plaintiff claimed

---

7 Mr. Melone sought damages and other relief solely under the provisions of the ADA.  He did not allege state law causes of action for intentional or negligent infliction of emotional distress.  Defendant's arguments regarding the evidence required to prove the elements of these causes of action are therefore beside the point.

emotional distress damages for depression, rage and fear resulting from his sudden firing.  The testimony showed that plaintiff's work was a very large part of his life, he took almost no vacations, and he sometimes put his company above his family.  The evidence also showed the plaintiff's firing was emotionally wrenching, even though he underwent no formal psychological treatment.  He was cut off from one of the major defining aspects of his life and he was forced to watch his family suffer emotionally and financially as well.  In upholding the award, the Seventh Circuit further stated that "the emotional burden on a person dying of cancer, perceiving himself as unable to adequately provide for his family, is considerably greater than that suffered by the ordinary victim of wrongful discharge." *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d at 1285-86.  The Seventh Circuit further noted that it had previously upheld numerous similar awards in cases in which plaintiffs were fired in violation of other civil rights laws.  The court specifically cited awards of $40,000 and $35,000.  The court concluded by stating that "[u]ltimately, it may be that [plaintiff] did not really deserve as much as $50,000, but that is not the question.  The question is whether the award was grossly excessive, and it was not." *Id,* at 1286.

Mr. Melone's testimony regarding the emotional distress he experienced was, like his testimony regarding his physical limitations, sketchy.  He did testify, however, that "when I got fired it was a big shock to me, because of the other problems I was going through and then being fired, I had a lot of emotional distress." Tr.-I  106:6-11.  He added that he had a "lot of anxiety and sleepless nights." *Id.*  Elsewhere, Mr. Melone stated that when he returned to work following the prostate surgery, "I was fighting a life threatening disease that stole my manhood.  I was physically and emotionally damaged." *Plaintiff's Exhibit "25."*  According to Mr. Melone, he had previously been one of Defendant's top producers.  Even after he returned to work, he performed above average, but could have done better, but for the physical and emotional trauma he was experiencing. *Id.*  Mr. Melone also stated in his chronology that several months after he was fired, he was "beginning to feel the effects of latent depression as a result of this disease and being fired from my job." *Plaintiff's Exhibit "28."*

Although the evidence of emotional distress is not as compelling as that in *EEOC v. AIC Security Investigations, Ltd.*, Mr. Melone was fired only two months after returning to work from

major prostate cancer surgery, and only one day after he told his sales manager that he would have to have another operation.  The evidence also indicates that he was unemployed for a substantial period after he was terminated.  The jury had sufficient evidence to conclude that Mr. Melone experienced significant emotional distress as a result of Defendant's conduct in firing him.  The award of $40,000.01 in emotional distress damages was not grossly excessive or monstrous.  Therefore, the Court would uphold this verdict if the Plaintiff had presented sufficient evidence to show that he was disabled within the meaning of the Act.

## CONCLUSION

Based on the foregoing, the Court concludes that there was no legally sufficient basis for a reasonable jury to find that Plaintiff was disabled within the meaning of the Americans with Disabilities Act prior to or at the time Defendant terminated his employment.  Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Judgment as a Matter of Law (#74) is **granted**.  The jury's verdict for Plaintiff is hereby set aside and final judgment shall be entered in favor of Defendant Paul Evert's RV Country, Inc.

DATED this 4th day of November, 2010.

GEORGE FOLEY, JR.
United States Magistrate Judge