1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                         **DISTRICT OF NEVADA**
6
7    CARMEN MELONE,                    )
8                          Plaintiff,  )        Case No.  2:08-cv-00868-GWF
                                       )
9    vs.                               )
                                       )        **MEMORANDUM OF DECISION**
10   PAUL EVERT'S RV COUNTRY, INC.,    )        **FINDINGS OF FACT AND**
                                       )        **CONCLUSIONS OF LAW**
11                        Defendant.   )
     _____)
12

13          Plaintiff Carmen Melone sued Defendant Paul Evert's RV Country, Inc. for violation of the

14   Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12110, *et seq.*, on the grounds that

15   Defendant terminated his employment because of his disability.  The issues of liability and

16   damages for emotional distress were tried to a jury on July 19-22, 2010.  The jury returned a verdict

17   in favor of the Plaintiff and awarded him emotional distress damages in the amount of $40,000.01.

18          The Court thereafter conducted a bench trial on September 1, 2010 on Plaintiff's claim for

19   back pay and/or front pay.  Prior to the bench trial, the Defendant filed a motion for judgment as a

20   matter of law.  On November 4, 2010, the Court granted Defendant's motion for judgment as a

21   matter of law and ordered that final judgment be entered for the Defendant. *See Order (#90) and*

22   *Clerk's Judgment (#91)*.  The Court therefore did not determine the amount of back pay or front

23   pay that Plaintiff would have otherwise been entitled to recover.  Plaintiff  appealed.  On October

24   28, 2011, the Court of Appeals for the Ninth Circuit reversed and remanded the case for entry of

25   judgment in favor of the Plaintiff in accordance with the jury verdict and the district court's rulings

26   on back pay and front pay. *See Memorandum (#103)*, *Mandate (#104)*, filed on November 17,

27   2011, and *Order on Mandate (#106)*, filed November 18, 2011.  The Court herewith issues its

28   findings of fact and conclusions of law on Plaintiff's claim for back pay and/or front pay.

1

## FINDINGS OF FACT

2       At all times discussed herein, Defendant Paul Evert's RV Country, Inc. ("Paul Evert's")

3 was engaged in the business of selling new and used motor homes or recreational vehicles

4 ("RV's").  Defendant operated three sales stores.  Its primary store was in Fresno, California.  It

5 also operated a store in Laughlin, Nevada and had a small store in Bullhead City, Arizona.[1]

6 Plaintiff Carmen Melone went to work for Paul Evert's as a salesman at its Laughlin store in 2003.

7 He was employed by Paul Evert's until the latter part of 2005 when he quit and went to work for

8 Wheeler RV in Henderson, Nevada.  Mr. Melone returned to work for Paul Evert's in January

9 2006.

10      Paul Evert's paid Mr. Melone and its other salesmen on a commission basis.  Mr. Melone

11 also received bonuses from motor home manufacturers for some of the sales.  The busy season at

12 Paul Evert's Laughlin store was from mid-October to mid-April.  TR (#70) 65:15-20.  Most of the

13 motor homes were sold during those months and that was the period during which the salesmen

14 earned the majority of their commissions and bonuses.   During the "off-season" months from May

15 through September, the salesmen worked less hours, took time off and/or worked various RV

16 shows to earn additional income.

17      Mr. Melone was diagnosed with an aggressive form of prostate cancer in September 2006.

18 He underwent prostatectomy surgery at the UCLA Medical Center in Los Angeles, California on

19 December 12, 2006.  Mr. Melone took an unspecified amount of time off from work before the

20 surgery.  Following the surgery, he was off-work until January 15, 2007.  Upon his return to work,

21 Mr. Melone experienced pain due to the surgical incision, fatigue and increasing problems with

22 urination.  While his duties as an RV salesman were not overly strenuous, Mr. Melone was required

23 to walk the RV lot, climb in and out of motor homes and stand for significant time periods.  TR

24 (#70) 68:14-25, 69:1-25, 70:1-11.  In mid-March 2007, Mr. Melone returned to UCLA for a follow-

25 up examination at which time he was scheduled for another surgery on April 24, 2007 to correct his

26 urinary problems. Mr. Melone informed Paul Evert's sales manager, Tom Schmid, on March 15,

27 _____

28      [1] Defendant later opened a sales facility near Portland, Oregon in April or May 2010.

2

2007 that he was scheduled for surgery in late April 2007.  The next day, Mr. Schmid terminated

Mr. Melone's employment.  Although Defendant presented testimony that it had valid

nondiscriminatory reasons for firing Mr. Melone, the jury found that Defendant fired Mr. Melone

because of his disability.  *Special Verdict (#64)*.

Mr. Melone began studying for the California real estate agent's examination in the summer

of 2006.  He testified that he had been a licensed real estate agent in Oregon before his employment

with Paul Evert's.  TR (#71) 35:1-2.  He testified that he pursued obtaining his California real

estate agent's license to "hedge his bets" and prepare for life after he retired from the RV sales

business.  TR (#71) 34:23-25, 35:1-10.  Mr. Melone also testified, however, that he enjoyed

working for Paul Evert's and had intended to work for Paul Evert's until retirement age or beyond.

TR (#86) 16:1-6.

Mr. Melone also testified that prior to his termination on March 16, 2007, he and his wife

put their Henderson, Nevada residence up for sale because he believed the housing market was

probably going to crash.  He stated that it was his intention to rent a home until the market settled.

The sale of the home was finalized on or about April 19, 2007.  Mr. Melone obtained his California

real estate agent's license before his follow-up surgery on April 24, 2007.  TR (#70), 101:13-15,

TR (#71) 36:19-20.   After the surgery, Mr. and Mrs. Melone moved to San Diego, California

where they had rented a home.  TR (#71) 38:12-14.  Mr. Melone testified that he and his wife were

not sure they would remain in California, but he "felt that southern California had a lot of RV

dealers and other opportunities besides just that."  TR (#71) 36:21-25, 37:1-10.  Mr. Melone also

testified that he had a close friend who had a commercial real estate practice in San Diego,

> — And he often times asked me to come to work for him.  He
> wanted me to come and work for him.  But I kept putting that off.  So
> after I was fired we decided to go to San Diego because of the
> opportunities.
>
> Q.     Okay. Did you - -
>
> A.     And then I studied for my real estate exam.
>
> Q.     Did you ever work for this individual?
>
> A.     For about probably two or three weeks.

3

1    Q.    And what happened then?

2    A.    It just didn't work out.

3    TR (#71) 36:21-25, 37:1-17.

4    Neither party's counsel asked any follow-up questions regarding why this employment

5    "didn't work out."  There is no indication that Mr. Melone earned any income from this brief

6    employment.  *See Exhibit 34, Melone's 2007 Tax Return.*[2]

7    During the September 1, 2010 bench trial, Mr. Melone testified that he looked for

8    employment with other RV sales companies and other types of businesses.  TR (#86) 13:7-20.

9    Plaintiff's "work search cards," which he was required to submit to the State of Nevada for

10   unemployment benefits, were also admitted into evidence.  *Exhibit 27.*  These cards indicate that

11   Mr. Melone applied for work with various RV sales companies and other businesses between

12   March and August 2007.  Except for his brief stint with the real estate company, however, Mr.

13   Melone did not obtain other employment until late 2007.  Mr. Melone received Nevada

14   unemployment benefits until September 2007.  *Exhibit 28, p. 111.*

15   According to Plaintiff's "Chronology of Events," Mr. Melone was unable to find any RV or

16   other sales opportunities in San Diego and he and his wife decided to look elsewhere.  *Exhibit 28,*

17   *p. 111.*  Mr. Melone's wife received a job offer in Portland, Oregon and they moved there on

18   October 12, 2007.[3]  *Id.  See also* TR (#86) 15:7-8.  Mr. Melone accepted a job offer from "Johnson

19   RV" in Portland, Oregon on November 4, 2007.  *Exhibit 28, p.111.*  Plaintiff introduced an IRS W-2

20   form showing that Mr. Melone earned $1,473.31 from RV Direct, Inc., Portland, Oregon, in 2007.

21

22

23   [2] All of the exhibits referred to in this order were stipulated into evidence by the parties in
     the *Pretrial Order (#39)*, filed on April 12, 2010.  Plaintiff's counsel marked his trial exhibits with
24   different numbers than those referenced in the Pretrial Order.  The Court required him to file a
     document reconciling the Pretrial Order exhibit numbers with the trial exhibit numbers.  *See*
25   *Corresponding Exhibits from Exhibit List to Pretrial Order (#61).*  All references are to the trial
     exhibit numbers.
26

27   [3] Mr. Melone testified that he incurred $7,500.00 in moving expenses associated with his
     moves from Henderson, Nevada to San Diego and then from San Diego to Portland, Oregon. TR
28   (#86) 15:9-11.

4

*Exhibit 35, p. 103.*

The chronology indicates Mr. Melone worked at RV sales shows during January, February and the first part of March, 2008. According to the March 13, 2008 entry in the chronology, Mr. Melone worked a 3-day show for Paradise RV. *Exhibit 28*, p. 111-112. A postscript to this entry states: "Too fatigued to work any more RV shows." *Id. p. 112.* Mr. Melone's 2008 W-2 forms, statements of miscellaneous income, and pay stubs indicate that he earned a total of $16,878.02 in 2008. *Exhibit 35.* On one of the pay stubs, Mr. Melone wrote: "Grand Total 2008 Earnings $16,248 thru March 08. Haven't worked since March." *Exhibit 35, p. 041.*

The chronology also indicates that Mr. Melone's PSA level began to rise in November 2007. It reportedly went from .32 on November 14, 2007 to 2.48 on February 5, 2008 and then to 3.61 on February 19, 2008. *Exhibit 28, p. 111.* The chronology entry for February 26, 2008 states that "Dr. Daneshmand at OHSU ordered a CAT scan and bone scan and placed me on a 90-day course of Lupron hormone therapy. The doctor explained to me that I have terminal advanced prostate cancer and has now spread throughout my body and has to be treated systemically. It is no longer localized." *Exhibit 28, p. 112.* Mr. Melone added a "postscript" to this entry which stated that the Lupron made him excessively fatigued and produced intense hot flashes. He also stated that he was beginning to experience latent depression as a result of the disease and being fired from his job. *Id.* The May 30, 2008 entry states that Mr. Melone received another 90 day course of Lupron which continued to make him extremely tired – "every other day I am in bed all day – and intense hot flashes continue. This entire affair has caused me to be latently depressed." *Exhibit 28, p. 112.* There are no further chronology entries after May 30, 2008 regarding Mr. Melone's physical or medical condition. The next and final entry, dated August 31, 2008, only discusses a conversation that Mr. Melone had with Mr. Schmid. *Id.*

There was also no specific testimony during trial concerning Mr. Melone's health or medical condition after May 30, 2008, other than that he was continuing to take Lupron. TR (#70) 91:24-25, 92:1. Mr. Melone appeared to be reasonably fit and healthy during the jury trial in July 2010 and at the brief bench trial on September 1, 2010.

. . .

Mr. Melone's income history during and after his employment with Paul Evert's was as follows:  In 2003, Mr. Melone had gross income of $101,295.00.  Of that amount, $95,810.41 was commission income paid by Paul Evert's and the balance was bonus income that he received from a manufacturer.  *Exhibit 30.*  In 2004, Mr. Melone had gross income of $127,322.00.  It appears that most of that income was from Paul Evert's.  The copies of the W-2 forms that Plaintiff submitted for that year are, however, illegible and unintelligible.  *Exhibit 31.*  In 2005, Mr. Melone's gross income was $88,819.00  The 2005 W-2 form from Paul Evert's is also illegible.  Mr. Melone was paid $20,077.82 by Wheeler RV in 2005.  He also received bonus income of $3,625.00 from manufacturers.  It therefore appears that Mr. Melone earned $65,116.18 from Paul Evert's during 2005.  *Exhibit 32.*  In 2006, Mr. Melone's gross income was $67,434.00.  He was paid $52,926.56 by Paul Evert's.  Mr. Melone earned additional income in 2006 from other RV dealers.  *Exhibit 33.*  Mr. Melone wrote a note on the bottom of his W-2 form from Paul Evert's that "06 was a very tough year for the RV industry.  Everyone's sales were off."  *Exhibit 33*, *p. 050.*

In 2007, Mr. Melone's total income from employment was $19,773.00.  He earned $18,299.89 during the two months he worked for Paul Evert's–January 15th to March 16th, and he earned an additional $1,473.31 from RV Direct, Inc. in Portland at the end of the year.  *Exhibit 35, p. 103.*  Mr. Melone also received $9,412.00 in Nevada state unemployment benefits during 2007.  *Exhibit 34, p. 045.*  In 2008, Mr. Melone had total income of $16,878.02, which he apparently earned between January and March.  *Exhibits 28 a*nd *35.*  There is no evidence that Mr. Melone worked or earned any income in 2009.

Mr. Melone testified at the September 1, 2010 bench trial that he was still looking for work.  TR (#86) 13:15-16.  He further testified:

> Q.     What are you looking for currently?
>
> A.      I've had – well, I was looking for RV work, and I since have been doing – looking at work in other areas, in sales, window sales, which is some of the income for 2010.

TR (86) 13:17-20.

. . .

. . .

1    No records were introduced, however, for any income that Mr. Melone may have earned in

2    2010.[4]

3         Mr. Melone testified that as a result of his termination by Paul Evert's, he lost his employer

4    paid health insurance.  He testified that he purchased COBRA coverage and paid a total of

5    $5,774.00 for that coverage from April 1, 2007 to April 30, 2008.  TR (#86) 9:3-25, 10:12, *Exhibits*

6    *36-38.*  Exhibit 38 indicates that Mr. Melone's monthly premium payment for COBRA coverage

7    was $387.30.  Thereafter, he became insured on his wife's employment health insurance.  The

8    Melones pay an additional $350.00 per month to insure Mr. Melone under his wife's health

9    insurance coverage.  Plaintiff also initially testified that he was deprived of the employer's

10   contributions to his 401K retirement plan as a result of his termination.  TR (#86) 11:2-25, 12:1-25,

11   and 13:1-5.  The evidence showed, however, that Mr. Melone cashed in his 401K retirement

12   account when he left Paul Evert's to work for Wheeler RV in 2005.  Mr. Melone was unable to

13   recall or otherwise show that he re-enrolled in the 401K plan after he returned to Paul Evert's in

14   2006.  TR (#86) 30:21-25, 31:1-25, and 32:1-11.

15        Paul Evert's vice president and general manager, Curt Curtis, testified that Paul Evert's

16   closed its Laughlin store on May 31, 2009.  TR (#71)  201:24-25, 202:1.  He stated that, industry-

17   wide, RV sales had started to decline in the latter part of 2006 and that the decline continued up

18   through the day of his testimony.  TR (#71) 207:12-15.  Mr. Curtis further testified during the

19   bench trial that the financial condition of Paul Evert's substantially deteriorated each year after

20   2006.  Gross sales declined from $113 million in 2006 to $100 million in 2007.  In 2008, the

21   business had gross sales of $64 million. They further declined in 2009.  TR (#86) 50:20-25, 51:1-8.

22   This decline in business was a major factor in the decision to close the Laughlin store.  TR (#71)

23   207:16-18.  Although the company maintained a store in Bullhead City, Arizona after the Laughlin

---

[4] Plaintiff's Bench Trial Opening Brief (#84), p. 4 states that Mr. Melone had earnings of $1,750.00 in 2010.  Exhibit 35, referenced in the brief, however, contains no record of earnings in 2010.  It is, of course, possible that Mr. Melone earned some income in 2010 through window sales.  Plaintiff, however, did not provide any information regarding the physical requirements of this sales work in comparison to RV sales.

1   store closed, Mr. Curtis testified that it only did one-tenth of the business that had been done at the

2   Laughlin store before its closure.  TR (#71) 212:5-16.  After the Laughlin store closed, the

3   company kept one of the two remaining salesmen from that store, who then worked at the Bullhead

4   City store.  The other employee left the company.  TR (#71) 212:23-25, 213:1-4, TR (#86) 53:24-

5   25, 54:1-25, and 55:1-5.  Mr. Curtis testified that Paul Evert's did not transfer employees between

6   its Fresno and Laughlin stores, or vice versa.  TR (#86) 53:12-14.

7        Mr. Curtis also testified on cross examination that the income of Paul Evert's salesmen

8   declined in a fashion commensurate with the decline in the company's sales. TR (#86) 57:13-25,

9   58:1-13.  He estimated that Paul Evert's sales have dropped 40 percent per year since 2006 and that

10  the income of the sales personnel declined at about the same rate.  *Id.*

11                          **CONCLUSIONS OF LAW**

12       The ADA provides that the remedies available for its violation are those available under

13  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5.  42 U.S.C. §12117(a).  The decision

14  to award back pay or front pay under Title VII and the ADA is an equitable one.  Although the

15  district court has wide discretion in fashioning appropriate Title VII remedies, including the award

16  of back pay, that discretion must be exercised in light of Title VII's objectives and Congress's clear

17  intent that district court's fashion the most complete relief possible.  *Thorne v. City of El Segundo*,

18  802 F.2d 1131, 1133 (9th Cir. 1986), citing *Albemarle Paper Company v. Moody*, 422 U.S. 405,

19  417, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975).  Once unlawful discrimination is found,

20  "backpay should be denied only if denial 'would not frustrate the central statutory purposes of

21  eradicating discrimination throughout the economy and making persons whole for injuries suffered

22  through past discrimination.'" *Thorne*, 802 F.2d at 1133-34;  *Odima v. Westin Tucson Hotel*, 53

23  F.3d 1484, 1495 (9th Cir. 1995).

24       A prevailing ADA claimant is presumptively entitled to all back pay which would have

25  accrued from the termination date to the entry of judgment provided the claimant exercised

26  reasonable diligence to secure other suitable employment.  *Quint v. A.E. Staley Manufacturing Co.*,

27  172 F.3d 1, 15 (1st Cir. 1999), citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231-32, 102 S.Ct.

28  3057, 73 Ed.2d 721 (1981).  As long as the claimant has made some effort to secure other

employment, the burden to prove failure to mitigate normally resides with the defendant-employer. *Odima v. Westin Tuscon Hotel*, 53 F.3d at 1497;  *Quint,* 172 F.3d at 16.  To satisfy its burden, the defendant must prove that "there were substantially equivalent jobs available which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one." *Odima*, 53 F.3d at 1497.

The Ninth Circuit in *Odima* rejected the argument that if the defendant-employer proves that the plaintiff failed to look for work, then the defendant is not required to prove that jobs were available. *Id.*  The First Circuit, in *Quint v. A.E. Staley Manufacturing Co.*, disagreed with *Odima* and stated that "[o]ther courts of appeal, squarely confronted with the present contention, uniformly have relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suitable employment."  *Quint*, 53 F.2d at 16, citing *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991); *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990).

In *Caudle v. Bristow Optical Company, Inc.*, 224 F.3d 1014, 1021 (9th Cir. 2000), the Ninth Circuit held that an employee is not entitled to recover back pay after the date that he or she has voluntarily withdrawn from the workforce for reasons not caused by defendant's discriminatory conduct.  In *Flowers v. Komatsu Mining Systems, Inc.*, 165 F.3d 554, 557 (7th Cir. 1999), the Seventh Circuit also stated that a plaintiff is not entitled to recover back pay for the period during which he was not physically able to work, with or without accommodation.  *Flowers* held that it was an abuse of discretion to award plaintiff back pay for the entire period from his termination until trial where the record showed that plaintiff underwent back and knee surgeries and was unable to work due to his medical condition for significant periods after he was fired.  *Flowers* states that the trial court must consider all of the relevant factors under the governing principles in deciding whether and to what extent a plaintiff is entitled to back pay.  *Id.* 165 F.3d at 557-8.

The record in this case shows that Mr. Melone made reasonable efforts to secure other suitable employment after he was terminated by Defendant.  Plaintiff's "work search cards" indicate that he applied for employment with RV sales companies and other businesses between

9

March and August 2007. After Mr. Melone and his wife moved to Oregon in October 2007, he was able to obtain part time employment at RV sales shows in northern California and Oregon. He worked at such shows from November 2007 through approximately mid-March 2008. Defendant argues that Mr. Melone should be denied back pay because he quit the job with his friend's real estate sales business. There is no evidence, however, that this was a viable employment opportunity. Mr. Melone's statement that the job "didn't work out" was not explored by either party. This brief and apparently unsuccessful employment is not a sufficient reason to deny Mr. Melone's claim for back pay.

Defendant did not otherwise meet its burden of proving that Mr. Melone failed to mitigate his loss of income during the one year period after his termination. As stated above, there is no evidence that Mr. Melone failed to diligently seek employment. Mr. Melone's lack of success in obtaining employment until late 2007 is consistent with the testimony of Defendant's vice-president, Curt Curtis, that the RV sales industry began to significantly decline in late 2006. It is not surprising, therefore, Mr. Melone would have had difficulty in obtaining regular employment with other RV dealers. The Court therefore concludes that Plaintiff is entitled to recover back pay for the one year period between March 16, 2007 and March 16, 2008.

Mr. Melone's claim for back pay after March 2008 is, however, highly questionable. Plaintiff's "Chronology of Events" states that Mr. Melone's physician told him in late February 2008 that he had terminal advanced prostate cancer which had spread throughout his body and had to be treated systemically. The physician placed Mr. Melone on a 90 day course of Lupron hormone therapy which caused him to be excessively fatigued and to experience hot flashes. By about March 13, 2008, Mr. Melone was "[t]oo fatigued to work any more RV shows." *Exhibit 28, p. 112.* On or about May 30, 2008, Mr. Melone received another 90 day course of Lupron therapy which continued to make him extremely tired and caused him to stay in bed all day, every other day. He also continued to experience intense hot flashes. Mr. Melone presumably completed the second 90 day course of Lupron therapy at the end of August 2008. Although the chronology contains a final entry on August 31, 2008, it does not comment on Mr. Melone's health. *Exhibit 28, p. 112.*

10

1          Mr. Melone testified at trial that he was still taking Lupron.  TR (#70) 91:13-25, 92:1.  He

2   did not state whether he continues to experience extreme fatigue or hot flashes from the medication

3   or whether he has experienced other symptoms as a result of his cancer.  Mr. Melone did not testify

4   about his physical ability to work, or what accommodations, if any, he would need to be able to

5   work.  Mr. Melone testified that he was still looking for work and had done some window sales in

6   2010.  He did not, however, present any evidence of earnings in 2009 or 2010.  As stated above, the

7   lack of employment does not, alone, justify the conclusion that the individual was not seeking

8   employment.  The evidence here, however, indicates that as of mid-March 2008, Mr. Melone was

9   not able to work as an RV salesman, even on a part time basis, due to extreme fatigue.  It also

10  appears that this condition continued, at minimum, for several months.  The absence of any

11  evidence that Mr. Melone's condition improved or credible evidence that he resumed employment

12  supports the conclusion that the causal link between Defendant's discriminatory conduct and Mr.

13  Melone's subsequent loss of income was severed as of mid-March, 2008.

14          Plaintiff argues that Mr. Melone's back pay award should be based on his average annual

15  "salary" during the four year period that he worked full time for Paul Evert's.  *See Bench Trial*

16  *Opening Brief (#84), p. 3.*  Plaintiff calculates this average annual salary as $104,265.53, or

17  $2,005.11 per week.  *Id.*  Plaintiff requests 110 weeks of back pay for the period from March 16,

18  2007 through May 31, 2009 when the Laughlin store closed.  Plaintiff concedes that the amount of

19  back pay should be reduced by 40 percent, based on Mr. Curtis' testimony regarding the decline in

20  RV sales and commissions beginning in late 2006.  Plaintiff  therefore requests an award of back

21  pay in the amount of $132,337.26, reduced by Plaintiff's actual earnings in 2007, 2008 and 2010.

22  Defendant provided no alternative method for calculating Mr. Melone's back pay award, but

23  argued, instead, that Mr. Melone should be denied any award of back pay because of his failure to

24  mitigate.  *See Defendant Response to Plaintiff's Trial Brief (#87).*  The Court rejects Defendant's

25  argument as unfounded.

26          The Court also rejects Plaintiff's method for calculating Mr. Melone's income for purposes

27  of his back pay award.  Mr. Melone was a commission salesman whose income was tied directly to

28  the amount of sales he made.  Averaging Mr. Melone's income over the four years he worked from

11

1  2003 through 2006 is misleading.  The only year in which Mr. Melone's income equaled or

2  exceeded $104,265.53 was 2004 when he had gross income of $127,322.00.  The income that year

3  increases the overall average, but does not reflect the true mean.  The evidence is also undisputed

4  that the RV sales industry began to decline in late 2006 and continued to decline thereafter.  Mr.

5  Melone's income from RV sales prior to 2006 is therefore not a reasonable indication of what his

6  income would have been in 2007 or 2008 if had he remained with Paul Evert's.

7        Mr. Melone's gross income in 2006 was $67,434.00 of which $52,926.56 was paid by Paul

8  Evert's.  The remainder was earned through sales that Mr. Melone did for other RV companies.

9  Although Plaintiff's employment with Paul Evert's was arguably year round, the evidence

10 established that the salesmen at the Laughlin store earned most of their commission income during

11 a six month period from mid-October to mid-April.  Thus, in 2006, Mr. Melone was able to earn

12 additional income through other RV dealers while still maintaining employment with Paul Evert's.

13 Mr. Melone's income in the last three months of 2006 was also probably affected by his illness.  He

14 missed an unspecified number of work days prior to his surgery on December 12th and he was off

15 work during the last two weeks of December.  Likewise, Mr. Melone was out of work the first two

16 weeks of January 2007 and it is reasonable to conclude that his physical problems adversely

17 affected his sales to some extent after he returned to work on January 15, 2007.

18        Given the declining RV sales market and Mr. Melone's physical limitations, it is fair to

19 conclude that his income from Paul Evert's in 2007 would have been less than it was in 2006.  The

20 Court is not persuaded, however, that it would have been forty percent less than his income in

21 2006.  According to Mr. Curtis, Paul Evert's gross annual sales dropped from $113 million in 2006

22 to $100 million in 2007.  That is an 11.5 percent decline.  There was apparently a steeper decline in

23 RV sales in 2008 and 2009.  The Court concludes that Mr. Melone's income from Paul Evert's in

24 2007 would have been approximately $47,500.00.  This approximation is based on the $52,926.56

25 that Mr. Melone earned from Paul Everts in 2006, discounted by the decline in commissions that

26

27

28

12

1   would likely have occurred in 2007.[5]  Mr. Melone's actual 2007 income from employment was

2   $19,773.00.  His loss of income for that year therefore is $27,727.00.

3         Mr. Melone was able to work the first two and a half months of 2008 and earned

4   $16,878.02 from RV sales.  By comparison, he earned $18,299.89 at Paul Evert's between January

5   15 and March 16, 2007.  As Mr. Curtis testified, and Plaintiff appears to concede, there was a

6   continuing decline in the RV sales industry during 2007 and into 2008.  Other than Mr. Curtis'

7   testimony, however, there was no specific evidence regarding the actual decline in Paul Evert's

8   sales revenues or its sales personnel's commission income.[6]  If the Court applies another 10 percent

9   reduction to Mr. Melone's probable income with Paul Evert's during 2008, his income for that year

10  would have been approximately $42,850.00.  Because the sales personnel earned most of their

11  income during a six month period which included January through March, the amount of income

12  that Mr. Melone would have earned during the first two and one half months of 2008 would have

13  been approximately $17,800.00  Although this is only an estimate, in furtherance of the statutory

14  goal of making Mr. Melone whole and because of the overall uncertainty as to what Mr. Melone's

15  earnings would have been if he had remained with Paul Evert's, the Court concludes that he should

16  be awarded an additional $1,000.00 in back pay for the first two and half months of 2008.

17        Mr. Melone is also entitled to recover $4,647.60 ( $387.30 X 12) that he paid in COBRA

18  premiums between April 1, 2007 through March 30, 2008.  *See Munos v. Oceanside Resorts, Inc.*,

19  223 F.3d 1340, 1348 (11th Cir. 2000).  These expenses were documented in Plaintiff's Exhibits 36-

20  38.

21        The Court declines to award Mr. Melone the $7,500.00 he claims for moving expenses.

22  First, Plaintiff did not introduce any documentation to support this claim.  Nor did he provide any

23  _____

24        [5] The Court does not use Mr. Melone's higher gross income of $67,434.00 as the bench
     mark because he earned $14,434.00 of that amount from other RV dealers.

25

26        [6] During the bench trial, Defendant's counsel attempted to have Mr. Curtis testify from
     Defendant's financial records, i.e., have Mr. Curtis in effect read those figures into the record.

27   Plaintiff objected on the grounds of hearsay and because Defendant had never produced such
     records in response to discovery requests or identified them as trial exhibits.  The Court sustained

28   the objections.  TR (#86) 44:18 through 49:16.

explanation or breakdown of the moving expenses.  The $7,500 figure is therefore speculative.  There is also significant doubt whether Mr. Melone was reasonably required to move in order to obtain other employment.  The initial move to San Diego appears to have been substantially motivated by Mr. Melone's desire to go into the real estate sales business.  The second move to Portland was also made because Mrs. Melone obtained a job in that state.

The Court will not reduce Mr. Melone's back pay award by the amount of the state unemployment benefits he received in 2007.  *See Kauffman v. Sidereal Corporation*, 695 F.2d 343, 346-7 (9th Cir. 1983) (holding that back pay award should not be offset by the unemployment benefits received by plaintiff) and *McLean v. Runyon*, 222 F.3d 1150, 1155-6 n. 17 (9th Cir. 2000) (indicating that Ninth Circuit case law is divided on this question and the district court may have discretion to impose an offset for unemployment benefits received by the discharged employee.) To the extent that the Court has the discretion to impose an offset, it will not do so here in view of the uncertainty regarding the income that Mr. Melone would have earned in 2007 and early 2008.

## CONCLUSION

Based on the foregoing, the Court concludes that Plaintiff is entitled to an award of back pay and reimbursement for COBRA benefits in the amount of $33,374.60.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff shall submit a proposed judgment to the Court in accordance with the jury's verdict and this order.

DATED this 27th day of December, 2011.

GEORGE FOLEY, JR.
United States Magistrate Judge

14